## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**BRADLEY DEATON**                                                    **PLAINTIFFS**
**and RAYMOND HATTEN**

**v.**                          **CASE NO. 2:23-CV-00120-BSM**

**UNITED STATES OF AMERICA**                                **DEFENDANT**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bradley Deaton and Raymond Hatten suffered injuries that landed them in the Regional One trauma center in Memphis, Tennessee. Their injuries occurred while serving as deck hands on the John T. Janoush ("John T."), which was attempting to navigate through the lock at dam number four on the Arkansas River. Deaton and Hatten were struck by a line that snapped. Both men had to be lifted from a barge in a make-shift basket and transported to the hospital by ambulance.

Deaton and Hatten are suing the United States Army Corps of Engineers for negligently operating the lock. The United States filed a third-party claim against plaintiffs' employer, Jantran, Inc., for providing inadequate lines to plaintiffs and for failing to properly train them.

Having conducted a seven-day trial and listened to 24 witnesses who generated more than 1800 pages of testimony, the negligence causing Deaton's and Hatten's injuries is apportioned as follows: forty-five percent to the Corps of Engineers and fifty-five percent to Hatten.

I.  FINDINGS OF FACT

A.     <u>Background</u>

There are eighteen dams on the Arkansas River and each one has a locking system that allows vessels to navigate through them.  The dams and locks are built and maintained by the Corps of Engineers, which employs lock operators to manage how vessels proceed when they reach the dam.  When a vessel traveling downstream reaches a dam, the operator is responsible for opening the upstream gate to the lock chamber and directing the vessel's pilot to move into the lock chamber.  Once the vessel is in the chamber, the operator closes the gate and lowers the water in the chamber until it is level with the water downstream of the dam.  The operator then opens the downstream gate and lets the vessel continue its journey. This process is done in the reverse when a vessel reaches a dam when traveling upstream.

Dam number four is typical of many of the dams on the Arkansas River.  Its lock chamber is 600 feet long and 110 feet wide.  Although this appears to be fairly large, it is not large enough to accommodate many of the barge tows that travel on the river.  For example, on the day at issue, the John T. was towing (actually pushing) twelve barges.  The barges were tethered together two by six, which created a tow, not including the John T. itself, that was 800 feet long by 105 feet wide.

To get through the dam, barges larger than the lock chamber have to make two trips. First, the lock operator opens the upstream gate.  The towboat pilot pushes the tow into the chamber.  The lock operator tells the pilot where to stop.  Once the tow reaches its designated location inside the lock chamber, the deck mates tie the first six barges to the chamber wall

and then untie the first group of six barges from the second group of six barges.  The first group of six barges is called the "first cut" while the second group of six barges is called the "second cut." Once the first and second cuts are separated, the towboat pilot pulls the second cut out of the chamber and the lock operator closes the lock gates.  Once the upstream gates are closed, the water in the chamber is lowered until it reaches the level of the water downstream of the dam.

While the first cut is still tied to the wall inside the chamber, a towboat employee who is standing on the chamber wall throws one end of a line down to a deck mate on the barge so it can be attached to a deck fitting called a kevel.  The towboat employee on the chamber wall attaches his end of the line to a tow haulage device on top of the chamber wall.  The tow haulage, commonly called a mule, is used to pull the first cut of barges out of the chamber.  This is necessary because the first cut is not attached to the towboat.  Once the first cut is attached to the mule, the first cut is untied from the chamber wall and the mule pulls the first cut out of the chamber.

There are fittings on the wall outside the chamber to which the first cut of barges is to be tied.  These are called wall pins.  The first set of pins is twenty-five feet outside of the chamber.  The second set is fifty feet outside the chamber.  The third set is seventy-five feet outside the chamber.  Additional pins are located every twenty-five feet down the wall.  Once the first cut clears the downstream gates, it is tied to these wall pins.  The lock operator closes the downstream lock gates and raises the chamber's water level until it is level with the water upstream of the dam.

-3-

Once the water in the chamber is level with the water upstream of the dam, the lock operator opens the upstream lock gates and the towboat pushes the second cut into the chamber, which is large enough to accommodate the second cut and the tow boat. The water inside the chamber is lowered until it is level with the water downstream of the dam. The downstream chamber gates are opened and the towboat pushes the second cut until it meets the first cut. The two cuts are then reconnected. This completes the double trip and the tow boat, along with its barges, continue their journey.

On occasion, a first cut has difficulty clearing the downstream gates notwithstanding the help it gets from the tow haulage. When this occurs, the lock operator may perform a flushing procedure in which he opens valves that cause water to flow into the chamber and expel the first cut of barges.

B.      March 21, 2022

On the day of the accident that injured Deaton and Hatten, the John T. had traveled north and was returning south on the Arkansas River. It had already made a trip through locks one to eighteen and back from lock eighteen through lock five. Approximately thirty minutes before it reached lock four, Michael Guilliams, a level four deck hand on the John T., was awakened. Deaton and Hatten were on the first cut of six barges. Deaton was manning the bow and Hatten was manning the stern.

The John T. pushed the first cut of barges into the lock, the barges were tied off to the chamber wall, and then Guilliams used his handheld radio to instruct the pilot of the John T. to pull clear of the chamber. Guilliams then climbed onto the chamber wall and gave the

lock ticket to Frankie Staton, the Corps's lock operator. The lock ticket told the operator how many barges the John T. was pushing, their tonnage, and what was on the barges. The chamber door was closed and the water lowered according to plan. Once the water in the chamber reached the level of the water downstream of the dam, Guilliams attached one end of a line to the mule and threw the other end down to the stern, where Hatten was posted. The mule line was attached to the stern kevel and the mule began pulling the first cut out of the lock.

The parties dispute how hard the wind was blowing but it is undisputed that it is common for the wind to blow on the Arkansas River and that it was not blowing so hard that anyone working on the John T. asked Staton to call off the double trip operation. It is also undisputed that, as the lock operator, Staton was responsible for managing the operations at dam four and for insuring the safety at that dam, and that Staton saw no reason to halt the double trip operation. Moreover, although the Corps absolutely disagrees with all testimony tending to show that Staton was negligent by failing to communicate with the crew of the John T., plaintiffs' witnesses unambiguously testified that they never heard from Staton during the operation at lock four.

Plaintiffs' witnesses testified that they could tell the mule was not pulling fast enough for the first cut to clear the downstream lock gates. It is also undisputed that the stern of the first cut failed to sufficiently clear the lock gates. The testimony was that a clearance of twenty-five feet would have been safe but that the stern of the first cut cleared the gates by only two to ten feet. Had the John T. cleared the gates by twenty-five feet, its barge kevels

would have lined up with the pins on the wall because the kevels on the first cut's barges were located every twenty-five feet from bow to stern.

Although Deaton disputes this, the evidence shows that Deaton, who was standing near the kevel on the bow of the first cut, walked back to the mid kevel, which is twenty-five feet from the bow.  He did this because the first cut did not clear the lock chamber sufficiently for him to attach a line from the bow kevel to the pin on the wall that he would normally use.  For this reason, he attached a line from the mid kevel to the pin on the wall closest to it.

On his radio, Deaton then called for Staton to feather the lock gates.  Feathering the gates is when the lock operator opens and closes the gates to get the water moving in order to push a cut out of the chamber.  Deaton and Guilliams testified that Staton never responded to Deaton's request.  It is also undisputed that the gates were never feathered.  Staton's decision not to feather the gates was appropriate because the first cut was too close to the gates for Staton to feather them.

Without notifying the crew of the John T., Staton began flushing the chamber.  The witnesses dispute whether Staton properly followed the two, four, six procedure when he opened the valves and began the flushing process.  This procedure advises that the lock operator first open the lock valves to two feet to see if that moves the tow out of the lock.  If two feet does not work, then the lock operator opens the valves to four feet.  If that does not work, the lock operator opens the valves to six feet.  Plaintiffs contend that Staton disregarded this procedure and opened the valves and flooded the chamber too quickly.

-6-

At some point after Staton opened the valves, the first cut began moving downstream out of the chamber but then, suddenly, began surging back upstream toward the chamber. Plaintiffs contend that the first cut's rapid surge back toward the chamber was directly caused by Staton opening the chamber valves and flooding the chamber too quickly. This is supported by the testimony of David Drummonds, who testified that flushing procedures are always followed by a surge of water back towards the lock. Indeed, "anytime the water is dumped out to move barges down[stream], it's always going to come back regardless . . . the slower the water is let into [the chamber] to push the barges out, the less [the] surge back [is]." Finally, he testified that the faster the water is let into the chamber, the " harder [it will come] back into the chamber."

Staton's failure to communicate with the crew of the John T. appears to have played an even more critical role in the first cut's surge back toward the chamber. This is true because, when Staton began flushing the chamber, Deaton had already tied off the mid kevel to the wall pin closest to it. Based on where the first cut was located, the mid-kevel was at least fifteen feet from the wall pin. Therefore, once the first cut started moving downstream, that line would have excess slack in it. Deaton was expecting the gates to be feathered or at least for Staton to inform him of the next move. But, without notice, Staton began flushing the chamber.

This is critical because, once Deaton attached the line between the mid-kevel and the wall pin, he never touched it again and this was the line that snapped when the first cut began rushing back into the chamber. It appears that when Deaton attached that line, Staton began

opening valves for the flushing procedure, and Deaton never had a chance to detach the line or check it down to take out the slack. When Staton opened the valves, the first cut moved downstream. The speed of the flush, coupled with slack in the line, appears to have caused the line to act almost like a rubber band. So much tension was put on the line when it was flushed downstream that it ultimately snapped back and caused the first cut to surge back toward the chamber. This, along with the wind, and the issues discussed by Drummond, caused the first cut to travel as fast as it did. Witnesses testified that the first cut was moving upstream faster than they had ever seen.

Deaton testified that he heard the line sizzling so he moved away from it because he knew it was going to snap. He then called to Hatten to catch a line to prevent the first cut from moving back into the chamber. Hatten, however, got tangled in his line. When Deaton saw that Hatten's line was going to snap, he ran back and pulled Hatten out of the tangled line. From all accounts, Deaton's actions appear to have saved Hatten's life. Almost immediately, Hatten's line snapped and both Deaton and Hatten were injured.

Guilliams, who was still standing on the dam wall, immediately climbed down onto the first cut and, using the same line that snapped and hurt Deaton and Hatten, attached the line to the dam wall and brought the first cut to a complete stop.

The parties spent a great amount of time addressing the fitness of the lines provided by Janoush. To this fact-finder, this evidence was not compelling because, as a practical matter, the same lines were used on the voyage up the river and then back down the river. Moreover, the same line that snapped and caused plaintiffs' injuries was the line that

Guilliams used to bring the John T. to a stop.

Although Deaton and Hatten present a very sympathetic picture, their inability to stop the first cut from surging back toward the chamber must be considered. This is one of those rare cases in which one does not have to guess what actions could have been taken or should have been taken, because Guilliams's actions clearly show that the first cut could have been safely stopped had Hatten not gotten entangled in his line.

For all of these reasons, the Corps's percentage of liability is forty-five percent because much of this could have been avoided had Staton clearly communicated with the crew of the John T. before initiating the flushing procedure. Moreover, as the lock operator, Staton was responsible for the safety of the operation that day. If, as argued by the Corps, the wind was so gusty that it created a dangerous condition, it was Staton's duty to call off the operation until the wind died down.

Notwithstanding Staton's actions or lack thereof, Hatten's negligence played a greater role in the injuries he and Deaton suffered. Had Hatten not gotten tangled in the line, he would have been able to step away from the line and avoid injury. Moreover, had he not been in peril, Deaton would have avoided injury. We know this because Deaton avoided injury when his line snapped. Moreover, any claim that Deaton and Hatten would have been injured if the first cut had collided with the chamber doors is offset by the actions of Guilliams, who was able to tie off the second cut without injury. For these reasons, fifty-five percent of the liability is apportioned to Hatten.

-9-

No liability is apportioned to Deaton because he properly tied off his line to the closest pin and he later saved Hatten's life. Although the Corps argues that he moved too far away from the mid-kevel to check down the line once the flushing procedure began, this argument is offset by the fact that the flushing procedure was initiated without notice and the evidence seems to indicated that, by the time Deaton was able to get close to the line, it was already sizzling and about to snap.

C.    Damages

Deaton is seeking $1,157,474 in damages. This includes lost wages of $729,048: $85,937 for wages lost from March 22, 2022 to July 7, 2025; and future lost wages of $634,111 for July 8, 2025 to February 28, 2048. He is seeking found damages totaling $437,426; $10,449 for the past and $426,977 for the future. Found damages account for the value of living expenses that individuals receive while employed on a vessel, such as food, lodging, and clothing. Hatten is seeking $1,709,179 in damages. This includes past lost wages and benefits of $146,933 and future lost wages and benefits of $1,562,263.

## II.  CONCLUSIONS OF LAW

Maritime negligence cases are somewhat similar to common law tort claims. To prove their case, plaintiffs must prove by a preponderance of the evidence that the Corps owed them a duty, that the Corps breached its duty, and that plaintiffs suffered damages as a result of the breach. *Pearce v. United States*, 261 F.3d 643, 647 (6th Cir. 2001) (elements); *Gavagan v. United States*, 955 F.2d 1016, 1022 (5th Cir. 1992) (preponderance of the evidence). The standard of care in maritime negligence cases is that of ordinary care under the circumstances.

-10-

*Bordelon Marine, Inc v. LaShip, LLC*, 703 F. Supp. 3d 766, 771 (E.D. La. 2023). This standard extends to government agencies like the Corps of Engineers. *See SCNO Barge Lines, Inc v. Sun Transp. Co., Inc.*, 595 F. Supp. 356, 361 (E.D. Mo. 1984). As to causation, defendant's negligence must be a "substantial factor" in plaintiffs' injuries. *Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir. 1985).

Moreover, pure comparative fault principles apply. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975); *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1427–28 (5th Cir. 1983) ("[C]omparative fault has long been the accepted risk-allocating principle under martime law); *Doyle v. Graske*, 565 F. Supp. 2d 1069, 1082 (D. Neb. 2008) (proportional division of liability applies in admiralty cases) (internal citations omitted). District courts have considerable discretion when assigning comparative fault. *See In re Marquette Trans. Co., LLC*, 292 F. Supp. 3d 719, 734 (E.D. La. 2018). Damages for past and future loss of wages and earning capacity, past and future medical expenses, and pain and suffering resulting from injuries caused by a defendant's negligence are all recoverable. *Matter of Lasala*, 644 F. Supp. 3d 245, 274–275 (E.D. La. 2022).

## III.  DISCUSSION

Plaintiffs' claims for past lost wages and benefits are reasonable and are awarded in full. For lost wages and benefits up until the day of trial, Deaton is awarded $96,386 and Hatten is awarded $146,933.

Neither plaintiff, however, has shown by a preponderance of the evidence that he is physically unable to ever return to work on the river or that he is mentally unable to obtain

training that will permit him to earn as much as he would earn working on the river.  For this reason, both plaintiffs are awarded future lost wages for five years.  This will permit them to obtain additional training at a trade school or junior college so they can mitigate their damages by finding a career that pays as much as they were paid by Janoush.  For Deaton, that is $234,339.  For Hatten, that is $216,380.

Each plaintiff is entitled to an award of $100,000 for pain and suffering.

Finally, both awards are reduced by fifty-five percent to account for the amount of liability apportioned to Hatten.

IV.  DAMAGES

For all of these reasons, defendant United States Corps of Engineers is ordered to pay plaintiff Bradley Deaton $193,826 ($96,386 + $234,339 + $100,000 x .45) and is ordered to pay plaintiff Raymond Hatten $208,491 ($146,933 +  $216,380 + $100,000 x .45).  Plaintiffs have fourteen days to submit their petitions for costs.

IT IS SO ORDERED this 3rd day of November, 2025.

UNITED STATES DISTRICT JUDGE